Edwin GREEN, Jr., as Administrator of the Estate of Edwin Green, Deceased, and Mary Green, Appellants,

v.

AMERICAN TOBACCO COMPANY, Appellee.

No. 19003.

United States Court of Appeals
Fifth Circuit.

May 2, 1962.

On Petition for Rehearing
June 20, 1962.

ow, Mary Green, also filed suit under the Florida Wrongful Death Statute.[3] The two suits were consolidated by order of the district court, and. came on for jury trial upon an amended complaint which asserted in separate counts six theories of liability: (1) Breach of Implied Warranty; (2) Breach of Express Warranty; (3) Negligence; (4) Misrepresentation; (5) Battery; and (6) Violation of the Federal Food, Drug and Cosmetic Act, the Federal Trade Commission Act, and the Florida Food, Drug and Cosmetic Act.

At the close of the plaintiffs' evidence, in a ruling not questioned on appeal, the district court sustained the defendant's motion for a directed verdict on all counts except Count 1, breach of implied warranty, and Count 3, negligence. At the close of all the evidence, the defendant renewed its motion for directed verdict on those two counts. The court reserved its ruling on that motion, and submitted the cases to the jury upon the two theories of liability, breach of implied warranty and negligence. The jury returned general verdicts for the defendant, and answered written interrogatories submitted under Rule 49(b), Federal Rules of Civil Procedure, 28 U.S.C.A., as follows:

Lawrence V. Hastings, Neal P. Rutledge, Miami, Fla., for appellants.

Samuel A. Brodnax, Jr., Hervey Yancey, Miami, Fla., Ralph D. Ray, New York City, for appellee.

Before RIVES, CAMERON and BELL, Circuit Judges.

RIVES, Circuit Judge.

Edwin Green, *Sr.*, brought suit against American Tobacco Company in December 1957, claiming that he had incurred lung cancer as a result of smoking defendant's product, Lucky Strike cigarettes. A few months later, on February 25, 1958, Mr. Green died. Under the Florida Survival Statute,[1] the claim survived, and Mr. Green's son, Edwin Green, Jr., appointed administrator of his estate, was substituted as plaintiff.[2] The wid-

"(1) Did the decedent Green have primary cancer in his left lung?.

"Yes  X

"No ————

"If your answer is 'Yes,' then

"(2) Was the cancer in his left lung the cause or one of the causes of his death?

"Yes  X

"No ————

"If your answer to the above question is 'Yes,' then

"(3) Was the smoking of Lucky Strike cigarettes on the part of the decedent, Green, a proximate cause or one of the proximate causes of

---

1.  Section 45.11, Florida Statutes 1959.

2.  Rule 25(a), Federal Rules of Civil Procedure.

3.  Sections 768.01, 768.02, Florida Statutes 1959.

the development of cancer in his left lung?

"Yes    X

"No ————

"If your answer to the above question is 'Yes,' then

"(4) Could the defendant on, or prior to, February 1, 1956, by the reasonable application of human skill and foresight have known that users of Lucky Strike cigarettes, such as the decedent Green would be endangered, by the inhalation of the main stream smoke from Lucky Strike cigarettes, of contracting cancer of the lung?

"Yes ————

"No    X    "

Upon the jury's verdict, judgment in each case was entered for the defendant. A cost judgment against the plaintiffs was entered in the amount of $1,969.74, which included $900.00 for expert witness fees assessed at the rate of $100.00 each.

Upon appeal, the plaintiffs present no questions as to the rulings on Count 3, negligence, but restrict their contentions to the theory of Count 1, implied warranty. As stated in their brief:

"Three question only are presented by these appeals:

"(1) Under the Florida doctrine of implied warranty are not the plaintiffs entitled to judgment as a matter of law, as requested in their post-trial motions under Rule 49(b), based upon the jury's special findings that the smoking of defendant's Lucky Strike cigarettes proximately caused the plaintiffs' decedent to contract a fatal case of cancer of the lung?

"(2) Did not the trial Judge err in refusing to grant plaintiffs' requested charges on the issue of implied warranty and in charging instead that the implied warranty of fitness

which a manufacturer under Florida law is held to make depends upon the ability of the maufacturer to know about the harmful substances in its product?

"(3) Did not the trial Judge err in taxing as costs against the plaintiffs a total of nine expert witness fees in the amount of $100.00 per expert, such sums being beyond the amount allowable and authorized by Federal statute?"

Edwin Green, Sr., began smoking Lucky Strike cigarettes in 1924 or 1925 when he was about 16 years old. He smoked from one to three packages per day until early 1956, when his physician advised him that he had contracted cancer of the left lung. By the time of diagnosis the cancer was no longer operable or curable. Ameliorating treatment was given, but the cancer proceeded on its typical, fatal course, and resulted in Mr. Green's death on February 25, 1958.

The testimony at the trial was concerned principally with the issues of whether Mr. Green's death was caused by a cancer originating in the lung, that is, primary lung cancer, and whether that cancer was caused by his smoking of Lucky Strike cigarettes. Eight eminent medical doctors testified on each side. They were in sharp disagreement. The district court properly submitted to the jury the questions of medical causation.[4] Their testimony was also in conflict on whether by February 1, 1956, when it was first discovered that Mr. Green had lung cancer, scientific knowledge had progressed to such an extent that the defendant could, by reasonable foresight, have learned that the smoking of cigarettes was a probable cause of lung cancer.

Plaintiff-appellants state their main insistence as follows:

"The fundamental point upon which the plaintiffs rely on this appeal is that the Trial Court erred, as a matter of law, in ruling that the

---

4. Montgomery v. Stary, Fla.1955, 84 So. 2d 34, 39; Metzel v. Robinson, Fla.1958, 102 So.2d 385, 386; see Great American Indemnity Co. v. Holloway, 5 Cir., 1960, 286 F.2d 106, 108–109.

implied warranty of fitness which a manufacturer of products for human consumption is held by Florida law to make does not cover deleterious substances in its products, the harmful effects of which are unknown to the manufacturer and could not have been known by any developed human skill or foresight. Plaintiffs contend that the knowledge of the manufacturer is irrelevant and immaterial to the manufacturer's liability on an implied warranty under Florida law, and that a manufacturer's implied warranty is not limited to harmful substances of which the manufacturer either had knowledge, or should have had knowledge or could have had knowledge according to developed human skill and foresight."

█ With that insistence we cannot agree. To the contrary, we are convinced that the doctrine of implied warranty by a manufacturer and seller of the qualities and fitness of the thing sold for the purpose for which it is intended or desired is founded on his superior opportunity to gain knowledge of the product and to form a judgment of its fitness. That principle can clearly be deduced from all of the Florida cases on implied warranty whether by the manufacturer or by the dealer.

In the comparatively early case of Berger v. E. Berger & Co., 1918, 76 Fla. 503, 80 So. 296, a dealer was held liable on an implied warranty that a lot of lumber was fit for the purposes for which the dealer knew that it was purchased. The court quoted at some length a passage from Benjamin on Sales (5th ed.) 595, beginning with the sentence: "An implied warranty, or as it is called, a covenant in law as distinguished from an express contract or express warranty, really is in all cases founded on the presumed intention of the parties and upon reason." 80 So. at 299. The court concluded:

"We think the rule is well established which embodies the principle above quoted that where a person contracts to supply an article in

which he deals for a particular purpose, knowing the purpose for which he supplies it and that the purchaser has no opportunity to inspect the article, but relies upon the judgment of the seller, there is an implied condition or 'warranty,' as it is called, that the article is fit for the purpose to which it is to be applied."

In Smith v. Burdine's Inc., 1940, 144 Fla. 500, 198 So. 223, 227, 229, 131 A.L.R. 115, a buyer requested of a saleslady at a cosmetic counter a good lipstick. The saleslady selected a certain lipstick and recommended it for its intended use. The lipstick contained a poisonous substance which allegedly injured the health of the buyer. In an action for breach of implied warranty of fitness the trial court directed a verdict for the defendant. The Florida Supreme Court reversed and held that whether the buyer relied on the judgment of the saleslady was for the jury, saying:

"The existence or non existence of an implied warranty of fitness for a particular purpose must and necessarily does depend upon whether or not the buyer relied upon his own judgment at the time of the purchase or relied on the skill or judgment of the seller, and this is a question of fact to be determined by a jury under appropriate instructions." (198 So. 229.)

In Blanton v. Cudahy Packing Co., 1944, 154 Fla. 872, 19 So.2d 313, a manufacturer or canner of a meat product, known as "Tang," sold to the retailer in sealed packages or cans was held liable to the ultimate consumer for breach of an implied warranty that such product is wholesome and fit for human consumption. The court said in part:

"The implied warranty theory of liability comports with the general trend of the best reasoned cases. The manufacturer knows the content and quality of the food products canned and offered to the public for consumption. The public generally is vitally concerned in wholesome food, or its health will be jeopard-

ized. If poisonous, unhealthful and deleterious foods are placed by the manufacturer upon the market and injuries occur by the consumption thereof then the law should supply the injured person an adequate and speedy remedy. It is our conclusion that the implied warranty remedy of enforcement will accomplish the desired end." (19 So.2d at 316.)

In Cliett v. Lauderdale Biltmore Corporation, Fla.1949, 39 So.2d 476, a guest sued the proprietor of a hotel dining room, claiming that he had become ill as the result of eating impure or unwholesome food. The action was based "on the theory of an implied warranty that the food was fit for human consumption." (39 So.2d 476.) The trial court sustained a demurrer to the complaint. The Florida Supreme Court reversed. In the course of its opinion, it quoted from Cushing v. Rodman, 65 App.D.C. 258, 82 F.2d 864, 868, 104 A.L.R. 1023, a passage beginning: " 'The basis of implied warranty is justifiable reliance on the judgment or skill of the warrantor * * *.' " Continuing, the Supreme Court of Florida said:

"Indeed, it would seem that if any distinction were to be drawn between the retailer and the restaurant keeper in such a transaction, the duty of the latter should be greater than that of the retailer who in many instances has no better opportunity for knowledge of the fact that certain foods may contain deleterious substances than has the ultimate consumer who purchases the article. For in a sense the restaurant keeper is the direct manufacturer of the meals he prepares in his own kitchen and serves to his guests in his dining room. It is hardly possible to think of any dishes prepared by him wherein his opportunity for knowledge of the ingredients is not far greater than that of the customer, hence he is in a position largely, if not entirely, denied to the guest to judge of their fitness before he serves them. As between the paying guest, who has no real means of determining whether the meal served is fit for human consumption, and the restaurateur, who is in a position to determine this fact before and during the period of preparation, the burden should properly rest with the one who has or should have such facilities to keep the food pure and fresh as to make an injury to the customer from their use highly improbable if not impossible." (39 So.2d at 478.)

In Lambert v. Sistrunk, Fla.1952, 58 So.2d 434, 435, the Florida Supreme Court held that there was no implied warranty arising from statements by defendant's salesmen that a stepladder was strong and would last a lifetime and that plaintiff would never break it. In part the Supreme Court of Florida said:

"It has been said that the concept of implied warranty rests upon the foundation of business ethics and constitutes an exception to the maxim 'let the buyer beware,' itself encompassing the idea that there is no warranty implied with respect to the quality of the goods being sold. To come into play, the exception must therefore spring from some moral obligation on the part of the seller, or perhaps more accurately, on the breach of some such duty amounting to fraud or the taking advantage of the buyer by reason of some superior knowledge in the seller, or the reliance by the buyer on the seller's judgment.

\* \* \* \* \* \*

"There is no need to dwell on the class of cases where the buyer relies upon the seller's judgment of the fitness of a particular article for the purpose intended, because the use of a stepladder is as well known to a buyer as to a seller and is as limited as it is well known. This feature is common to the lipstick involved in Smith v. Burdine's, Inc., supra [Fla.1940, 198 So. 223]. The difference, as we have already observed,

is in the nature of the articles sold. One cannot know the ingredients of a lipstick without chemical analysis. One can know as much as a salesman of a stepladder by simply looking at it. And this lack of opportunity to inspect was also a factor in the case of Blanton v. Cudahy Packing Co., supra [Fla.1944, 19 So.2d 313]."

See also Florida Coca Cola Bottling Co. v. Jordan, Fla.1953, 62 So.2d 910; Hoskins v. Jackson Grain Co., Fla.1953, 63 So.2d 514; Food Fair Stores of Florida v. Macurda, Fla.1957, 93 So.2d 860; and Miami Coca Cola Bottling Co. v. Todd, Fla.1958, 101 So.2d 34.

The appellants rely most strongly upon two very recent cases decided by the Supreme Court of Florida. Sencer v. Carl's Markets, Fla.1950, 45 So.2d 671, and Carter v. Hector Supply Co., Fla.1961, 128 So.2d 390. In Sencer v. Carl's Markets, supra, it was held that a retail dealer in food products sold in sealed packages or cans is liable to the consumer on the theory of implied warranty for injuries sustained because of a deleterious, unwholesome or unfit substance for human consumption appearing in the sealed package or can. The trial court had sustained demurrer to the plaintiff's complaint. The Supreme Court of Florida reversed, two justices dissenting, two concurring specially, and three concurring in an opinion in effect approving the argument of counsel for appellants stated as follows:

"Counsel for appellants point out that the duty to offer and sell wholesome food in sealed cans and packages to the consuming public should rest alike on the manufacturer and retailer because the retailer is experienced in buying from the manufacturers; he is acquainted with the products and the manufacturers; he relies upon representations made to him. The public is vitally concerned in wholesome food or its health will be jeopardized and a legal distinction as to liability as between the manufacturer and retailer should not exist." (45 So.2d 673.)

Justice Hobson concurring specially, in an opinion in which he was joined by Justice Terrell, stated:

"Furthermore, I am of the opinion that the retailer who is sued and against whom judgment might be secured, should, in turn, be allowed to sue the manufacturer, which is the reason for my disagreement with the views expressed by Associate Justice Tillman. I do not follow his thought that holding a retail grocer liable in a case of this character would result in bankrupting the individual independent grocer. The retail merchant can avoid placing himself in a position wherein he could not, in turn, sue the manufacturer by electing to purchase only from responsible manufacturers within the jurisdiction of the courts in which he might enter suit." (45 So.2d 673.)

Thus, the implied warranty by the retailer was sustained not only because of the retailer's better position in selecting and dealing with the manufacturer, but because the retailer had a right of indemnity over against the manufacturer.

In Carter v. Hector Supply Co., supra, the action was by an injured employee of a purchaser of a riding sulky against the retailer. The Florida Supreme Court held that the employee could not impose liability on the retailer on the basis of implied warranty because of absence of privity of contract. That point is not important here because in this litigation no privity defense was raised.

In the course of its opinion, however, the Florida Supreme Court did say that the employee "relied entirely on an alleged implied warranty in order to impose absolute liability regardless of fault on the retailer with relation to whom there was no privity." Further in the course of its opinion, the Florida Supreme Court disagreed with the holding of the District Court of Appeal (122 So. 2d 22) to the effect that proof of actual or implied knowledge of the defect on the part of the retailer is essential to his lia-

bility on an implied warranty. The Supreme Court of Florida said:

"The ultimate holding of the court of appeal is to the effect that proof of actual or implied knowledge of a defect on the part of a retailer is essential to his liability on an implied warranty in an action brought by one other than the purchaser. The court of appeal relied upon Lambert v. Sistrunk, Fla.1952, 58 So.2d 434. Here again we think its confidence was misplaced for the simple reason that Lambert involved a direct purchaser-seller situation in which the purchaser had an opportunity equal to that of the seller to inspect the item purchased. It did not involve a third party effort to impose implied warranty responsibility on a retailer.

"The instant holding of the court of appeal, however, is essentially correct in finding that a retailer could be held liable to a third party in a *negligence action* as contrasted to absolute liability under an *implied warranty* only if the retailer could be charged with actual or implied knowledge of the defect. Again we emphasize that in the case at bar Carter relied entirely on an alleged implied warranty in order to impose absolute liability regardless of fault on the retailer with relation to whom there was no privity. Finding as we do that the lack of privity between these parties precluded the implication of a warranty, the plaintiff would necessarily be relegated to an action in tort for negligence. Actually this, in effect, is where the ultimate judgment of the court of appeal placed him. In that event, in the type of situation immediately before us, it would be necessary for him to prove that the retailer knew, or should have known, of the defective condition of the commodity. To this extent the court of appeal ruled correctly in holding that proof of this element would support a finding of fault on the part of the retailer.

This is in direct contrast with the rule that such proof is wholly unnecessary in an implied warranty situation." (128 So.2d 392.)

The actual holding of the court was thus expressed:

"The sum of our holding here simply is that one who is not in privity with a retailer has no action against him for breach of an implied warranty, except in situations involving foodstuffs or perhaps dangerous instrumentalities, a problem not presently here." (128 So.2d 393.)

If the language in Carter v. Hector Supply Co., supra, relied on by appellants, is anything more than dictum, it does not go so far as to sustain the appellants' position in the present case. It does not say that it is immaterial that the manufacturer could not have known, or had no opportunity to gain knowledge, or to form a judgment as to the dangerous qualities of the product manufactured and sold.

We think, therefore, that the jury's general verdicts for the defendant are sustained by its negative answer to special interrogatory No. 4.

"No. 4. Could the defendant on, or prior to, February 1, 1956, by the reasonable application of human skill and foresight have known that users of Lucky Strike cigarettes, such as the decedent Green, would be endangered, by the inhalation of the main stream smoke from Lucky Strike cigarettes, of contracting cancer of the lung?"

The defendant could not be held liable as an absolute insurer against consequences of which no developed human skill and foresight could afford knowledge. The district court did not err in charging the jury that,

"* * * The manufacturer of products which are offered for sale to the public in their original package for human consumption or use impliedly warrants that its products are reasonably wholesome or fit for the purpose for which they are

sold, but such implied warranty does not cover substances in the manufactured product, the harmful effects of which no developed human skill or foresight can afford knowledge."

Founded on the presumed intention of the parties and upon reason is the doctrine that the existence or nonexistence of an implied warranty of fitness for a particular purpose depends upon whether or not the buyer, at the time of the purchase, relies on the skill and judgment of the seller. The buyer is presumed so to rely only when the seller is thought to have a superior opportunity to exercise such skill, or to gain knowledge of the product or of its source, and hence to form a better judgment of its fitness. The common sense of that doctrine may be appreciated by foreseeing its probable application to three different classes of products intended for human consumption: (1) those believed by all to be wholesome, for example, most foods; (2) those known by all to be injurious to some while perhaps beneficial or pleasurable to others, for example, alcoholic beverages; (3) those heretofore thought by all to be wholesome or tolerable, but which constantly expanding scientific research, thought and knowledge have now proved, or at least convinced many, to be injurious, such as cigarettes in the smoke of which appear polycyclic aromatic hydrocarbons and minute quantities of arsenic, and eggs, milk and butter with their high cholesterol content—and what the future may develop the most vivid imagination cannot foretell. Applying that doctrine, as we have stated it, to (1), no absolute liability is imposed upon the seller unless the product contains some foreign substance, is spoiled, or differs in some way from the product it is represented to be. As to (2), the same exceptions obtain; otherwise, the buyer knows as much about the article as the seller, and relies upon his own judgment rather than that of the seller. As to (3), that doctrine leaves as a question of fact to be determined by the jury under appropriate instructions whether the seller, in the estimation of the parties, had a superior opportunity to gain knowledge of the product or its source, and, hence, whether the buyer, at the time of purchase, relied on the judgment of the seller. It is that doctrine, thus founded upon reason and on the presumed intention of the parties, which, we think, is clearly to be deduced from all of the Florida cases.

■ Under the present statute, 28 U.S.C.A. § 1821, the district court had no authority to tax costs for compensation to an expert witness in excess of the statutory attendance per day, mileage and subsistence allowance.[5] The cost judgment is therefore reversed for entry by the district court of a judgment in accordance with this opinion. The judgments for the defendants are affirmed. Costs of appeal are taxed against the appellants.

CAMERON, Circuit Judge (dissenting).

The jury in this case found that Edwin Green, Sr., age 49, died of primary cancer of the lung, which was proximately contributed to by his smoking of Lucky Strike Cigarettes, produced for human consumption by appellee American Tobacco Company.[1] Having thus found, the jury rejected the appellants' claim for Green's death, because the trial court required that they must find that the injurious substance so established to have been in the cigarettes and its harmful effects would have been revealed to American "by the reasonable application of human skill and fore-

5. Henkel v. Chicago, St. P., M. & O. Ry. Co., 1932, 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386; Department of Highways v. McWilliams Dredging Co., W.D.La., 1950, 10 F.R.D. 107, aff'd 5 Cir., 1951, 187 F.2d 61; Cheatham Electric S. D. Co. v. Transit Development Co., 2 Cir., 1919, 261 F. 792, 796; Firtag v. Gendle-

man, Dist.Ct.D.C., 1957, 152 F.Supp. 226; Commerce Oil Refining Corporation v. Miner, Dist.Ct.R.I., 198 F.Supp. 895, 897–898, 6 Moore's Federal Practice, § 54.77 (5), p. 1367.

1. It is not contended that there was lack of privity between American and Green.

sight." This limitation on the jury was in effect the equivalent of a charge that the exercise of reasonable care on the part of American would exonerate it from liability. I think the charge was clearly erroneous.

This appeal is predicated solely on the theory that American breached its implied warranty to Green. I do not think that one who warrants wholesomeness can escape liability by showing that it exercised reasonable care in its efforts to achieve it. Such an idea is, in my opinion, a refutation of the whole concept of warranty. Because I do not believe that the inclusion of this limitation upon American's duty under implied warranty was justified, I am unable to join in the majority opinion affirming the action of the court below.

## I.

This Court recently[2] delineated the general nature of implied warranty:

"For the purpose of this appeal the defendants apparently concede that the evidence is sufficient to sustain the findings of the jury that the plaintiff ingested the crab shell at Arnaud's and that it caused his injury. In our view there was ample evidence before the jury to justify these findings. It is contended, however, that the court *erred in trying the case on the theory of implied warranty* and in holding that plaintiff was not required to prove that Arnaud's was guilty of negligence, either actually or by the application of the doctrine of res ipsa loquitur. [p. 885] * * *

"The primary question for determination is whether under the decisions and law of Louisiana the proprietor of a public eating place *who serves a food fabricated by him* and containing a foreign substance * * * *is under an absolute liability for damages* proximately resulting from the impurity under the

theory of *an implied warranty of fitness.* Our review of the authorities convinces us that such is the law of Louisiana. Consequently, the trial court correctly enforced and applied this principle in the trial of the present case.

"This rule of liability was first announced in Doyle v. Fuerst & Kraemer, 129 La. 838, 56 So. 906, 907, 40 L.R.A.,N.S., 480, where the Supreme Court of Louisiana held that the seller of food at a public eating place is *conclusively presumed to know any unwholesome condition of the food and is answerable in damages to a purchaser who is made ill because of the unwholesomeness.* The basis of this holding was said to be that:

" '* * * every one ought to know the qualities, good or bad, of the things which he fabricates in the exercise of the art, craft, or business of which he makes public profession, and that *lack of such knowledge is imputed to him as a fault,* which makes him liable to the purchasers of his fabrications for the damage resulting from the vices or defects thereof which he did not make known to them and which they were ignorant of.'

\* \* \* \* \* \*

"While the Court was there [Le-Blanc v. Louisiana Coca-Cola Bottling Co., 221 La. 919, 60 So.2d 873] dealing with a manufacturer's liability for injuries caused by the consumption of deleterious ingredients contained in a bottled beverage, it carefully pointed out that under Louisiana jurisprudence *a plaintiff in such a case is entitled to rely upon the manufacturer's implied warranty that its product is safe for human consumption.*" [Emphasis supplied.]

While we were dealing in Arnaud's case with the presence of a foreign ob-

2. Arnaud's Restaurant, Inc. et al. v. Cotter, 5 Cir., 1954, 212 F.2d 883, certiorari denied, 348 U.S. 915, 75 S.Ct. 295, 99 L. Ed. 717.

ject, that was not the determinant fact; we placed great reliance upon and quoted from the Doyle case from the Supreme Court of Louisiana, where the consumer had been made sick by eating food purchased from the seller with respect to which the seller made uncontradicted proof of the exercise of the highest degree of care in its preparation. Nevertheless, the Supreme Court of Louisiana held that the seller was "at fault if these articles proved to be vitiated and deleterious."

The law there applied was the law of Louisiana, while here we are sitting as a Florida court and applying Florida's law. The quoted language is of some importance for the reason that the Supreme Court of Florida, in a case [3] which it described as presenting a question of first impression, referred to the Doyle case, supra, as one of the authorities it relied upon in fashioning the Florida rule governing the doctrine of implied warranty. In Cliett the Florida court stated:

"The sole question for determination on the pleading is *whether the proprietor of a public restaurant or dining room who serves a meal containing unwholesome food* to a paying guest for immediate consumption on the premises *is under an absolute liability for the damages proximately resulting from the impurities, on the theory of an implied warranty* of fitness. * * *

"Some courts have held that in the absence of statute a victualer serving food for immediate consumption on the premises may not be held liable for food deleterious to health, without proof that he was guilty of negligence; while others have determined that aside from any question of negligence such a purveyor of foods for a valuable consideration *is under an absolute liability for unwholesome food served by him, on the theory of an implied warranty of fitness.* * * *

"In our opinion the implied warranty theory of liability comports with the general trend of the better reasoned cases and is supported, on principle at least, by decisions from our own jurisdiction. * * *

"These cases establish the principle that as to items of *food or other products* in the original package which are offered for sale for human *consumption or use generally,* a person who purchases such items in reliance upon the express or implied condition or assurance that they are wholesome and fit for the uses or purposes for which they are advertised or sold, and who is injured as the result of *unwholesome or deleterious substances* therein which are unknown to the buyer, may hold either the manufacturer or the retailer liable in damages for injuries sustained by him, on the theory of an *implied warranty of wholesomeness or fitness* of such article or product for the purposes for which it was offered to the public." [Emphasis added.]

In Sencer et al. v. Carl's Markets, Inc., 1950, 45 So.2d 671, the Florida Supreme Court, en banc, was considering the claim against the dealer, not the manufacturer, of persons made sick by eating sardines from a can from which they were served to the consumers. It held that both the manufacturer and the dealer were liable if unwholesome food were offered to the consuming public, quoting from Vol. 1, Williston on Sales, Rev.Ed., page 635:

" 'The imposition of absolute liability* upon a dealer who sells canned goods of reputable manufacture has been denied in a few decisions on the ground that the seller cannot possibly discover that a particular can is defective, and that it is, therefore, unjust to subject him to liability. The same argument, however, may be made in regard to any implied warranty, not only of

---

3. Cliett v. Lauderdale Biltmore Corp., Fla., 1949, 39 So.2d 476, 477.

food *or other articles, where* the buyer must have been aware that the seller could *not discover a defect if it existed.* Accordingly, if canned goods are to be made an exception to the general rule governing sales of food, the whole law of implied warranty should be revised and placed on another basis.

" 'But the general principle of the common law is opposed to this, and certainly if a dealer is ever to be made liable for injuries caused by defective goods *where he has been guilty of no fault,* the reasons are stronger for holding him liable for selling defective food than in any other kind of sale. And by the weight of authority, presumably for these reasons, a dealer is liable for selling such food even though in sealed containers of a reputable brand.' "[4]

In Miami Coca Cola Bottling Company, Inc. v. Todd, 1958, 101 So.2d 34, the Florida court recognized the rule of the above cases in this comment:

"The bottler recognizes that Florida law places bottlers of cold drinks under the same rule of absolute liability of implied warranty as canners of food, Florida Coca-Cola Bottling Company v. Jordan, Fla., 1953, 62 So.2d 910."

In extending the implied warranty rule to a seller of seed, the Supreme Court of Florida, en banc,[5] recognized the continuing validity and vitality of the foregoing rules in these words:

"The general rule that an ultimate purchaser may not sue the wholesaler is not an absolute one and it seems to be losing force with the passage of time. For instance, this court has recognized the principle 'that *as to items of foods or other products* in the original package which are offered for sale for human consumption *or use generally,* a person who purchases such items in reliance upon the express or *implied condition or assurance that they are wholesome and fit* for the uses or purposes for which they are advertised or sold, and *who is injured as the result of unwholesome or deleterious substances therein* which are unknown to the buyer, may hold either the manufacturer or the retailer liable * * *.'

"There is a conflict of opinion about the accountability of a manufacturer to a consumer on the theory of implied warranty in the absence of privity, but this court has become aligned with those courts holding that suit may be brought against the manufacturer notwithstanding want of privity. * * * " [Emphasis added.]

The question of whether the rule of implied warranty in products cases arose from contract or from tort was settled by the Supreme Court of Florida in Carter v. Hector Supply Co., 1961, 128 So.2d 390, 391: "Perhaps in its judicial incipiency the rule of liability on implied warranty was grounded in some measure on the law covering deceit and therefore assumed the complexion of a tort action. However it is now generally agreed that the implication of a warranty arises out of a contractual relationship. * * * " That case involved an effort by a purchaser to apply the implied warranty rule against a seller with whom he was not in privity the subject of the sale not being for human use. In rejecting the application of the implied warranty

---

4. The majority opinion takes note of the fact that two Justices concurred specially and two Justices dissented. None of them, however, differed with the majority in holding that the duty of the manufacturer was absolute. Judges Terrell and Hobson merely emphasized that they were in favor of holding the retail grocer, because otherwise the consumer in many cases could not reach the manufacturer. The dissenting Justices were in favor of holding the manufacturer, but not the dealer, to the same absolute liability the majority had declared to be the rule in Florida.

5. Hoskins v. Jackson Grain Co., 1953, 63 So.2d 514.

rule in such a case, the court (p. 392) used language indicating clearly that, in products for human use cases where privity always exists, the implied warranty of the seller is absolute:

"Again we emphasize that in the case at bar Carter relied entirely on an alleged implied warranty in order to *impose absolute liability regardless of fault* on the retailer with relation to whom there was no privity. Finding as we do that the lack of privity between these parties precluded the implication of a warranty, the plaintiff would necessarily be relegated to an action in tort for negligence. Actually this, in effect, is where the ultimate judgment of the court of appeal placed him. In that event, in the type of situation immediately before us, it would be necessary for him to prove that the retailer *knew, or should have known,* of the defective condition of the commodity. To this extent the court of appeal ruled correctly in holding that proof of this element would support a finding of fault on the part of the retailer. This is in direct contrast with the rule that *such proof is wholly unnecessary in an implied warranty situation.* * * *" [Emphasis added.][6]

A reading of these cases and authorities demonstrates to me clearly that Question 4 as framed was effective in presenting to the jury only the claim that Green's death resulted from American's negligence and that it ignored entirely the liberal Florida rule based upon implied warranty, which was covered by another count in the complaint.

To establish their claim based upon negligence it was admittedly incumbent upon appellants to prove that American knew, or by the exercise of proper care— probably more than reasonable care— could have known, that the nicotine [7] and arsenic present in the smoke from Lucky Strikes were likely to do harm to the decedent. The count based on negligence was submitted to the jury, which found in favor of American and no appeal was taken from that portion of the verdict. But the duty of the appellants to prove that American could, by the reasonable application of human skill and foresight, anticipate that Lucky Strikes would endanger decedent's health was not, under Florida law, a part of an action based upon implied warranty.

Every warranty is a promise by him who makes it, a contract, a stipulation, an assurance that the subject of the warranty will be performed or that the warrantor will make good the loss arising from its breach. Under Florida's law, the implied warranty was an unconditional guarantee to Green that the use to which the cigarettes would be put, as understood by all, would not do him harm by reason of any deleterious substance or ingredient contained in them.

I think the Florida cases establish a rule of law which constitutes a condition of every sale of a product for human consumption or use, which has the same legal effect in this case as if appellee had entered into a written contract with decedent, covering every package of cigarettes purchased by him, couched in these words:

American guarantees that the cigarettes contained in this package are

---

**6.** From these cases it is plain that Florida is in the vanguard of those states, as yet numerically in the minority, which are holding purveyors of food and other products for human consumption to an absolute liability under the doctrine of implied warranty. The cases on the subject are legion and are collected in annotations found in 74 A.L.R.2d 1111, et seq., 75 A.L.R.2d 39, et seq. and 44, et seq., and 77 A.L.R.2d, pp. 61, et seq., 66, et seq. and 122, et seq. And see "Implied Warranty in Florida," 12 U. of Fla.Law Review, 241, 245–246; Prosser, "The Assault upon the Citadel (Strict Liability to the Consumer)," 69 Yale Law Journal 1099; and Frumer and Friedman, "Products Liability" (1960), pp. 1–8.

**7.** Defined in Webster's New World Dictionary, College Edition, p. 991, as " * * * a poisonous alkaloid * * * found in tobacco leaves, from which it is extracted as a colorless, oily, acrid, transparent liquid * * *."

fit to be used by purchaser, a human being, by lighting and drawing smoke from them into the lungs, so that the ingredients of the cigarettes carried in the smoke may be deposited on the walls of the blood vessels situated therein, to the end that said ingredients will be absorbed into the blood stream and will produce in the smoker the soothing and relaxing sensations normally attending such use; that said cigarettes do not contain any harmful or deleterious substance; and that it will indemnify the user against any injury, loss or damage which may result from the smoking of said cigarettes.

## II.

As I understand the majority opinion, the effort is made to distinguish the Florida cases from the one before us chiefly on the ground that the decided cases deal with situations where some foreign object or substance was at the root of the injury caused the user. I understand further that the majority thinks that the fact that the Florida Court has, in several of the cases, adverted to the ease with which a manufacturer could determine the presence *vel non* of deleterious substances, as compared with the opportunity given the purchaser to gain such knowledge, demonstrates that the Florida Court intended to make proof of foreseeability of harm by the exercise of reasonable care a *sine qua non* of recovery under the implied warranty rule. I am not able to agree with the majority on either score, and I think the italicized passages quoted from the Florida decisions, supra, demonstrate the error into which, in my opinion, the majority has fallen. A brief résumé of the cases will be helpful.

In Arnaud's the presence of a piece of shell which should not have been in the dish served to the customer was mentioned, but what we stressed in that opinion was that the food *was in fact unwholesome when served*. It is clear from our opinion that the unwholesomeness alone fastened liability, the hold-

ing being that the seller was conclusively presumed to know of the existence of any unwholesome condition regardless of its cause, and that lack of knowledge is implied to him as a fault. This is plain from the language of the opinion, as well as the further holding that the implied warranty is that the product is *safe* for human consumption or use.

The Florida Court, in Cliett, held without equivocation that the seller is under an absolute liability if he serves unwholesome or impure foods regardless of their character or source. It emphasized too that the warranty applied to products for human use generally—not only food.

Sencer was decided on the allegations of the complaint. A storekeeper had served a can of sardines which, when eaten, produced sickness. The complaint alleged, alternatively, that the sardines "contained foreign or dangerous matter deleterious within itself." The court did not reject the complaint on the ground that it did not allege that the sardines contained some foreign matter, specified or otherwise. It was enough that *whatever the can of sardines contained was deleterious within itself*. That was held sufficient by the Supreme Court of Florida. As to the matter of knowledge of what was in the can of sardines or ability to acquire such knowledge, the storekeeper of course was wholly without any means of obtaining knowledge—yet absolute liability was fastened upon him.

In Hoskins neither knowledge nor the presence of a specified foreign substance was mentioned. The opinion holds simply and clearly that there is absolute liability where products in the original package are sold for human use or consumption and that injury results by reason of the presence of some unwholesome or deleterious substance.

The Florida Court in Carter emphasized again that, where products were sold for human consumption, proof that the seller knew or ought to have known of the unwholesome condition was "wholly unnecessary."

I am unable to read into the Florida decisions the ideas which the majority advances as the basis for its failure to follow what seem to me to be the clear and unequivocal holdings of the cases discussed. It is true that the court adverts, more than once in these cases, to the plain fact that the manufacturer or seller was in much better position to acquire knowledge of the nature and characteristics of the ingredients of the thing sold than the purchaser for use. These discussions, it seems to me, were in justification of its determination to apply the stringent implied warranty doctrine to this limited field of sales contracts instead of imposing on the purchaser the difficult task of proving negligence. There is, as I see it, no indication that the court was intending to water down the absolute obligations of a contract of implied warranty to the level of proof governing tort actions.

It is significant also that American does not rely on a single Florida case to support its position. It is content to rely on the contention that, granted that Green died because he smoked Lucky Strike cigarettes, the maker of them should not be held liable for his death unless the jury could find from the evidence that it could, in the exercise of reasonable care, have known that the deleterious substances in Lucky Strike cigarettes would do him harm. Little good will be done by discussing the cases from other states which do not follow the rule embraced by the Florida Court with respect to implied warranty as governing such sales. Since American prints, as an appendix to one of its briefs, the entire opinion of the Court of Appeals for the Third Circuit in Otto E. Pritchard v. Liggett & Myers Tobacco Co., 1961, now reported in 295 F.2d 292, I will comment on the holdings of that case which, it seems to me, contains more which is favorable to the Greens than to American.

In his action for damages based upon the claim that he had contracted lung cancer from smoking Chesterfield cigarettes between 1921 and the time his lung was removed in 1953, Pritchard based his claim of liability upon implied warranty of merchantability and negligence. The District Court for the Western District of Pennsylvania dismissed the action founded upon breach of warranty, and granted the Tobacco Company's motion for directed verdict as to plaintiff's charges of negligence. The Court of Appeals for the Third Circuit reversed both rulings. Since Pritchard's action was predicated upon Pennsylvania's Uniform Sales Act, 69 P.S. §§ 1–339, which establishes quite different bases of liability, including the element of knowledge, from the common law of Florida as recognized by its court decisions, very little can be gained by discussion of this phase of the decision. It is sufficient to observe that the Court thought that the evidence adduced to the trial court was sufficient to support a case based upon Pennsylvania's restricted rule of implied warranty or upon negligence, and indicating even that it was sufficient to sustain a claim based upon express warranty.

### III.

In Pritchard the plaintiff offered evidence, held inadmissible for insufficient proof, of the existence of 795 articles allegedly dealing with the harmful effect of tobacco upon the human body. Certainly such evidence, coupled with that in the record before us and information possessed by everyone,[8] make it certain that we are dealing with a situation of recognized seriousness.

8. In the issue of Newsweek Magazine of March 19, 1962 is an article headed "On the Line Again," which describes a report just made by the Royal College of Physicians in London bearing the title "Smoking and Health." It is stated that the Society issued an unequivocal indictment of cigarettes. The statistics included in the report are anything but reassuring in connection with tobacco and lung cancer, coronary heart disease, and gastric ulcers. And the public press of April 7, 1962 carries a U. P. I. release which states: "The Italian parliament has passed a bill outlawing advertising for cigarets and other tobacco products."

## IV.

An illuminating dissertation on "Implied Warranty in Florida" appears in the University of Florida Law Review, Fall 1959, Vol. XII, No. 3, pp. 241, et seq.[9] A quotation from two of its paragraphs will be found interesting:

"The subject of products liability is probably the most rapidly expanding area of substantive law at the present time. There are at least three reasons for this: * * * Moreover, goods are frequently packaged in sealed containers, and often the purchaser does not have the ability, the opportunity, or the desire to make an inspection of the articles purchased. Third, the masterful and realistic logic of Mr. Justice Cardozo in the famous MacPherson v. Buick Motor Co. case (217 N.Y. 382, 111 N.E. 1050) in the year 1916 has given to courts and counsel strong impetus, and in some cases perhaps the necessary courage to re-examine previous decisions on the subject [Page 241] * * *

"By way of summary, it will be seen that although the doctrine of MacPherson v. Buick Motor Co. has been responsible for a great and beneficial change in the law relating to products liability, there is still a great deal of confusion in a majority of the states and glaring contrast among the comparatively few settled principles as they are applied in the various jurisdictions. Happily, Florida has gone to the forefront of the states that have resolved the questions involved in this area in a logical and just manner * * *." [Pages 247–248]

Before summarizing briefly the points of difference between the majority and myself, I quote a rule which the authors of the Law Journal article distilled from two of the Florida cases which the majority and I have adverted to (Pages 253–254):

"Five years after the Blanton case, Cliett v. Lauderdale Biltmore Corp. nailed down the liability in food cases.

"Rule XI. *A seller of food for value to immediate consumers is absolutely liable for injuries as a result of unwholesomeness of the food on the implied warranty of fitness for human consumption regardless of negligence, the basis being the reliance of the consumer on the seller's skill and judgment.*" [Emphasis in the original.]

I understand to be basic in the rule of implied warranty of fitness announced by the majority "whether or not the buyer, at the time of the purchase, relies on the skill and judgment of the seller." There is no dispute on this question here. Green, before his death, testified that he bought Lucky Strike cigarettes in sealed packages from the grocery store just as he bought many items of food packaged by reputable manufacturers; that he had no notice that, and made no investigation to determine whether, harmful ingredients were present and that he had never had a cigarette subjected to chemical analysis and had never had an occasion to do so. He stopped using them when he was advised that he had contracted lung cancer.

The majority treats cigarettes in the original package as belonging in the category of foods as respects application of the doctrine of implied warranty.[10] But

9. While a good number of the cases discussed in this dissent and in the majority opinion are analyzed in the article, its main conclusions are inapplicable to the problem before us inasmuch as it states, "The survey, however, will be confined to the questions of defects in the articles sold * * *."

10. There would seem to be no question as to this since the cases, beginning with the

Cliett case, referred to "*foods or other products*" and added the words "use generally" as an alternative for the words "human consumption." As is pointed out above, the "consumption" of a portion of the smoke coming from Lucky Strike cigarettes is as real as the "consumption" of a portion of any item of food introduced into the human system through the alimentary canal.

it segregates "products intended for human consumption" into "three different classes." In class one, it places most foods; in class two, it places alcoholic beverages; and class three includes cigarettes. The basis for this classification I have been wholly unable to find. Certainly, as I understand them, the Florida cases do not give any hint of such a classification.

Strangely enough, the majority holds that no absolute liability is imposed upon the seller of foods "believed by all to be wholesome." Liability as to food, according to its thinking, exists only where the food contains some foreign substance, is spoiled, or differs in some way from the product it is represented to be. If the majority is correct in this, the writings of the Florida courts have, in my opinion, been in vain and the law of implied contracts governing sales of food is the same that it was before Mr. Justice Cardozo wrote the MacPherson opinion and the Florida Supreme Court decided the Cliett case.[11]

Nor do I find any statement in any Florida case which justifies the discrimination which the majority opinion makes in favor of purveyors of such articles as cigarettes. Finally, as I read them, the Florida cases do not justify the charge quoted in the majority opinion excepting the manufacturer from the absolute liability imposed upon it if the jury should find that the reasonable application of human skill and foresight would not reveal the harmful ingredients which the jury had found the accused cigarettes contained.

For these reasons I respectfully dissent.

ON PETITION FOR REHEARING.

PER CURIAM.

So far as concerns this case, the following facts are established by the jury's answers to interrogatories under Rule 49 (b), Federal Rules of Civil Procedure, 28 U.S.C.A.: (1) The decedent Green had primary cancer in his left lung; (2) the cancer in his left lung was the cause or one of the causes of his death; (3) the smoking of Lucky Strike cigarettes on the part of the decedent, Green, was a proximate cause or one of the proximate causes of the development of cancer in his left lung; (4) American Tobacco Company could not on, or prior to, February 1, 1956, by the reasonable application of human skill and foresight, have known that users of Lucky Strike cigarettes, such as the decedent, Green, would be endangered, by the inhalation of the main stream smoke from Lucky Strike cigarettes. of contracting cancer of the lung.

Those interrogatories were propounded and answered upon the assumption of certain facts which appear without dispute, such as: (a) At all pertinent times American Tobacco Company has

11. Sight seems to have been lost of the actions of the court below which are brought before us for review. The appellants filed in writing requests that the court spell out for the jury the Florida law of implied contracts as established with respect to products for human consumption. These several instructions refused by the court below incorporated principles taken directly from decided cases. Illustrative of them is Instruction No. 22 reading as follows:

"Implied Warranty

"The Supreme Court of Florida has recognized that the principle 'that as to items of food or other products in the original package which are offered for sale for human consumption or use generally, a person who purchases such items in reliance upon the express or implied condition or assurance that they are wholesome or fit for the uses or purposes for which they are advertised or sold, and who is injured as the result of unwholesome or deleterious substances therein, which are unknown to the buyer, may hold either the manufacturer or the retailer liable.' "

Cited as support for this requested instruction were the Hoskins and Cliett cases, supra.

A long discussion was had between the lawyers and the court concerning the requested instructions. The court stated that an exception would be allowed with respect to each instruction which was marked refused and that it would not be necessary for the plaintiffs to take any further exception.

been and still is the manufacturer and distributor of Lucky Strike cigarettes; (b) by February 1, 1956, the primary cancer in the left lung of decedent Green had been definitely diagnosed. He died on February 25, 1958.

 In this diversity action, Florida law governs the rights and liabilities of the parties. Does the law of Florida impose on a manufacturer and distributor of cigarettes absolute liability, as for breach of implied warranty, for death caused by using such cigarettes from 1924 or 1925 until February 1, 1956, the cancer having developed prior to February 1, 1956, and the death occurring February 25, 1958, when the defendant manufacturer and distributor could not on, or prior to, February 1, 1956, by the reasonable application of human skill and foresight, have known that users of such cigarettes would be endangered, by the inhalation of the main stream smoke from such cigarettes, of contracting cancer of the lung? There is no Florida decision precisely in point and so clearly on all fours as to be dispositive of this question or proposition of law.

In view of the importance of the question, and in especial consideration of the fact that one of the Judges of this Court dissented from this Court's disposition of that question on original hearing, and that the Judges of this Court, on petition for rehearing, remain of the same views as expressed in their opinions on original hearing, this Court has decided to grant the petition for rehearing to the extent necessary to certify such question or proposition of the laws of Florida to the Supreme Court of Florida, as provided for under Section 25.031, Florida Statutes 1959, F.S.A., as implemented by Rule 4.61 of the Florida Appellate Rules, 31 F.S.A. (In re Florida Appellate Rules, Fla., 127 So.2d 444, March 1, 1961). See Clay v. Sun Insurance Office, 1960, 363 U.S. 207, 212, 80 S.Ct. 1222, 4 L.Ed.2d 1170; Sun Insurance Office v. Clay, Fla., 133 So.2d 735.

The parties are requested to stipulate, if possible, the contents of the certificate as provided for in said rule. If they are unable so to stipulate, they should report to this Court their respective views on or before August 1, 1962.[1]

To such extent the petition for rehearing is

Granted.

---

1. Such report may be typed, and accompanied by brief which may be either typed or printed, at least four legible copies to be filed.